UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BIGID, INC.,<br><br>                    Plaintiff,<br><br>          -against-<br><br>NICKOLAS S. MAXWELL,<br>                    Defendant. | Index No.:<br><br><br>**<u>COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff BigID Inc. appears before this Court to file this Complaint against Nickolas S. Maxwell and alleges as follows:

## <u>The Parties</u>

1.      Plaintiff BigID Inc. ("BigID" or "Plaintiff") is a corporation incorporated and registered in Delaware with a registered office and place of business located at 379 West Broadway in New York, NY.

2.      Defendant Nickolas S. Maxwell ("Defendant" or "Maxwell") is an individual formerly employed by Plaintiff through its wholly-owned subsidiary, BigID UK Ltd. ("BigID UK"), the entity with whom Plaintiff contracted for the performance of certain services.  At all of the relevant times alleged below, Defendant's work was for the ultimate benefit of Plaintiff BigID, and the duties owed by Defendant were owed to BigID.  Upon information and belief, Defendant resides in Manchester in the United Kingdom and is not now and has never been domiciled and/or a legal permanent resident of any State in the United States.

## <u>Jurisdiction and Venue</u>

3.      Venue in this District is proper pursuant to 28 U.S.C. § 1391 *et seq*., because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred and/or a

substantial part of property that is the subject of the action is situated in this District and/or because Plaintiff BigID resides in this District.

4.      Jurisdiction in this District is proper pursuant to 28 U.S.C. § 1332 in that the parties to this action are, on the one side, a citizen of this State and, on the other side, a citizen of a foreign state who is not domiciled in or a legal permanent resident of this State.  The amount in controversy, exclusive of interest and costs, exceeds $ 75,000.

**Plaintiff's Business**

5.      Plaintiff is a software company that helps organizations connect the dots across data and AI: for security, privacy, compliance, and AI data management.  BigID enables customers to find, understand, manage, protect, and take action on high risk & high value data, wherever it lives.  Customers use BigID to reduce their AI & data risk, automate security and privacy controls, achieve compliance, and understand their data throughout their entire data landscape: from the cloud, on-prem, and everywhere in between.

6.      In terms of employee workspace, Plaintiff is a hybrid remote company operating from multiple locations in the United States, as well as additional locations overseas, including in the United Kingdom.  In terms of the relevant corporate structure, Plaintiff is a Delaware corporation with a registered office at 379 West Broadway in New York, and it is the parent company of BigID UK.  Because its primary corporate office in the United States is in New York and specifically within this District, BigID also maintains its primary corporate bank account in this District, at JP Morgan Chase Bank (the "JPMC Account").  Funds at issue in this Complaint originated from the JPMC Account located in this District.

7.      As the parent company, Plaintiff has agreements in place for the performance of certain services that are needed for Plaintiff's overall business.  In particular, Plaintiff contracts

with BigID UK for the performance of sales and marketing services, as set forth in an Intercompany Agreement between BigID and BigID UK, which has been effective as of December 30, 2019 (the "Intercompany Agreement").  That Intercompany Agreement for the performance of sales and marketing services in turns provides that BigID UK may engage people for the provision to BigID of the contracted for sales and marketing services.  The Intercompany Agreement is governed by the laws of New York, and each party to that Agreement has agreed to the non-exclusive jurisdiction of New York State courts.

8.      Because BigID is the parent company and BigID UK is a contractor providing limited sales and marketing services to Plaintiff BigID, BigID UK does not operate or maintain corporate services such as human resources, finance or legal support.  Those corporate services, as well as BigID deal desk support, expense report audits, and commission calculations, are provided in the United States by the corporate parent, Plaintiff BigID.

9.      Pursuant to the Intercompany Agreement, BigID pays BigID UK for the sales and marketing services BigID UK provides to and for the benefit of BigID.  BigID bears most of the foreign exchange risks that may arise in connection with its payments to BigID UK that then need to be converted to another currency, such as pounds sterling.

10.     Pursuant to the Intercompany Agreement, BigID UK was also obligated to maintain "such books, records and statements as may be necessary to comply with all applicable laws and give a complete record of all transactions carried out by" BigID UK.  The "books, records and statements" required under the Intercompany Agreement include properly-reported expenses incurred by BigID UK on BigID's behalf because that information is then used by BigID to prepare its corporate taxes and audited financial statements.

11.     With respect to the employees employed to fulfill the services provided by BigID

UK for the benefit of BigID, salaries and expenses are paid by funds originating from BigID's JPMC Account. BigID pays BigID UK for sales and marketing services that BigID UK provides through, *inter alia*, the employ of people including Defendant. BigID UK then converts the funds paid into the appropriate currency. As a result of payments originating from BigID's New York JPMC Account to BigID UK's account at HBSC bank, BigID UK pays the employees who work on behalf of BigID, including Defendant. BigID maintains all rights of access to its New York JPMC Account, including the rights to disburse funds for payment to BigID UK.

12.     Upon information and belief, Maxwell was well aware that, although employed by BigID UK and based in the United Kingdom, his work was for the benefit of the parent company BigID, and well aware that he owed a duty of utmost loyalty and care to BigID for at least the following reasons. First and foremost, a significant part of Maxwell's overall compensation package was the grant of stock options in BigID. Those BigID stock options were granted to Maxwell pursuant to a Stock Option Agreement governed by the laws of the State of Delaware. Second, Maxwell's additional compensation in the form of salary and reimbursement for expenses was paid with funds being directed and disbursed by BigID. Third, BigID was the parent company of wholly-owned BigID UK, and the marketing and sales functions Maxwell performed were for BigID services. Fourth, on a practical level, Maxwell regularly and exclusively interacted with employees, executives and offices of the parent BigID, including for human resources, legal, finance, commission calculations and deal desk support because none of those services is provided by BigID UK.

**Maxwell's Employment**

13.     Maxwell began his employ with BigID UK on March 1, 2022. Maxwell signed an employment agreement dated January 12, 2022. When Maxwell began his employment on

March 1, he further agreed to and signed BigID's Business Expense Policy (the "Policy").  The signed Policy is with BigID (not BigID UK) and was executed by Maxwell and his supervisor, BigID's Chief Revenue Officer.

14.     In exchange for agreeing to reimburse Maxwell for "reasonable expenses wholly and properly incurred" in the course of employment, Maxwell agreed and was obligated to, *inter alia*, comply with the terms of BigID's Policy, while always exercising "prudent and sound" judgment that accorded with the requirements in the Policy for the reimbursement of expenses.

15.     Maxwell was employed as Senior Vice-President of Sales, one of the services for which Plaintiff contracts with BigID UK pursuant to their Intercompany Agreement.

16.     Maxwell was in a very senior position, with only two executives in more senior roles, one being the Chief Executive Officer and the other being the Chief Revenue Officer, who was Maxwell's manager.

17.     Per the employment agreement between Maxwell and BigID UK, Maxwell was made aware that, as an employee of BigID UK, he could be called upon to work outside of the United Kingdom.  Specifically, that agreement provided that BigID UK "may also require you to travel and make visits throughout the UK and overseas as is reasonably necessary to carry out your job."

18.     As part of his employment, Maxwell did in fact travel extensively.  That travel included traveling to this District, including but not limited to attending business reviews that took place in this District.  In addition, as necessary to perform his actual, day-to-day duties, Maxwell regularly interacted with BigID's United States personnel and offices, including personnel and offices primarily located in this District and in New Jersey, for corporate services only provided by BigID, including but not limited to coordination of sales efforts, finance and

5

legal services.  Moreover, Maxwell's manager was based in this District and in New Jersey at all relevant times.

19.    Given his senior-level executive position, and because Maxwell was made aware that his position would involve travel, it was incumbent on him to conduct his travel and claim his travel-related expenses accurately and truthfully—in accordance with BigID's Policy, as signed by Maxwell, and in accordance with Maxwell's fiduciary duty as a senior-level executive. Expense reimbursements are reserved for "reasonable expenses wholly and properly incurred" for the benefit of BigID's business.

20.    Over the course of his employment, Maxwell submitted expenses and was reimbursed by BigID, through the BigID payroll process, in an amount in excess of $ 700,000. Those expense reimbursements were also claimed by BigID on BigID's corporate taxes filed in the United States, and reported in its audited corporate financial statements on a consolidated basis under US Generally Accepted Accounting Principles (US GAAP).

21.    However, in or about the fall of 2024, serious red flags went up about the legitimacy and veracity of Maxwell's expense claims and/or the manner in which he was submitting claims for reimbursement.  In light of those red flags, BigID began conducting an internal investigation (the "Investigation") in the United States, specifically New York and New Jersey.  That Investigation would ultimately require hundreds of hours of employee time that otherwise would have and should have been spent on the actual business of BigID.

22.    As the Investigation continued, Plaintiff was unable to obtain satisfactory explanations to the questions posed to Maxwell with respect to hundreds of his claimed expenses, including basic requests for supporting documentation demonstrating that Maxwell had incurred certain expenses for a business purpose, as he was required to submit under the

Policy and duty-bound to do given his senior position.  Some of those expenses are reflected in the attached Exhibit A and include expenses described as "No documented business purpose." As the Investigation progressed, the scope of Maxwell's abuse of his senior position with respect to his expense reimbursement submissions grew and Maxwell's unwillingness and/or refusal to provide supporting documentation for the growing number of questionable expenses claims became more suspicious.  As a result, in or about September 2024, BigID made the decision to freeze any further expense reimbursements for Maxwell.  As just one example, in or about November 8, 2024, a member of BigID's Finance Team rejected reimbursement for a claim submitted by Maxwell in the amount of approximately $ 1,678 for a hotel expense purportedly incurred in this District.  This rejection was warranted because, in fact, Maxwell had already been reimbursed for this expense; he had claimed it for reimbursement in an earlier expense report.

23.    Initially, the Investigation was undertaken primarily by members of the Finance Team at BigID (the "Finance Team"), and, given the magnitude of the problem, the Finance Team reported on the progress of Investigation to other senior BigID executives, including the Chief Executive Officer, the Chief Revenue Officer, the Chief Financial Officer, and the General Counsel.  BigID was the corporate entity investigating Maxwell's expenses claims because, among other reasons, BigID was the entity that had caused the reimbursements in question to be paid, had claimed them on its corporate taxes, reported them on its audited financial statements, and was the entity that had issued the Policy pursuant to which expense reimbursements are to be claimed.  The expense tracking system that Maxwell used to perpetrate the activities complained of herein was operated in the United States by BigID and the relevant records were accessed and processed in New York and New Jersey.  For purposes of this litigation, those records would also

be retrieved primarily from this District and from New Jersey.

24.     To ensure that the Investigation was accurate and objective, and also because the scope of Maxwell's improper expenses claims was so extensive it became too time-consuming to be handled solely by BigID employees, external forensic accounting services at Marcum LLP ("Marcum") were also secured and ultimately paid for by BigID.

25.     As alluded to above, part of the Investigation included communications with Maxwell himself.  When it became apparent that there were numerous expense claims submitted by Maxwell that were, at a minimum, highly suspicious if not outright fraudulent, senior members of the Finance Team, with the participation of BigID's legal team, interviewed Maxwell to go through some of the most obviously problematic expenses claims, including claims that were illegitimately submitted two or three times to wrongfully obtain multiple reimbursements.

26.     On a lengthy phone call on October 7, 2024 (the "October 2024 Interview"), members of the Finance Team interviewed Maxwell to go through at least some of Maxwell's expenses claims, with the participation and support of BigID's legal team.  The Finance Team members who primarily conducted the October 2024 Interview included the Corporate Controller and the Director of General Accounting, and they were joined by a member of the Legal Team (collectively, the "Finance and Legal Team Investigators").  The Finance Team Members who primarily conducted the October 2024 Interview, were based and are based in New Jersey and this District.

27.     During the October 2024 Interview, the Finance and Legal Team Investigators went through numerous expenses Maxwell had claimed in 2023 and 2024.  During the course of the October 2024 Interview, Maxwell made admissions, including acknowledging that he had

been reimbursed for expenses in excess of what was proper and that he would have to pay back money that had been wrongfully disbursed to him and to which he was not entitled.

28.    Toward the end of the October 2024 Interview, Maxwell asked the Finance and Legal Team Investigators what the exact amount was that he owed back to BigID, and Maxwell was told that getting to the final figure would take some additional investigation that depended in large part upon Maxwell's cooperation, and his providing additional information that was uniquely in his possession.  During the October 2024 Interview, Maxwell was asked to provide a complete set of credit card statements, airline and hotel loyalty program statements and wallet records, as well as, in some instances, narrative explanations reflecting the business reasons justifying certain expense claims—if any.

29.    After the October 2024 Interview, the Finance Team and Legal Team Investigators followed up with Maxwell to, at a minimum, obtain the additional information he had been asked to provide, which in turn would have facilitated the Finance and Legal Team Investigators and Marcum in providing a definitive figure of the amounts Maxwell owed back to BigID, which might have resolved this matter.

30.    On October 18, 2024, Maxwell provided statement information for one American Express card.  However, that was not sufficient to complete the Investigation because Maxwell had put the charges at issue across multiple credit cards.  Moreover, a charge reflected on a credit card statement alone does not demonstrate a valid business purpose under the Policy; it shows only the basic details of a charge having been made.  Upon information and belief, Maxwell was well aware that statement information for just one American Express card would be inadequate to complete the Investigation given the sheer number of charges and expenses claims he had submitted and been reimbursed for by BigID, and the fact that corroborating documents and

records remained in uniquely in his possession.

31.    On October 29, 2024, Maxwell was informed again that he needed to provide a complete record of all the credit cards he had used for various travel expenses and his hotel and flight wallets.  Despite multiple attempts to follow up with Maxwell, he did not cooperate further.

32.    Instead, a few weeks after the October 2024 Interview, Maxwell resigned upon learning that BigID was going to suspend his employment and promptly initiate a disciplinary hearing that could result in his termination for cause.  His official last day was November 17, 2024.  At the time Maxwell resigned, the Investigation was ongoing because BigID was unable to complete the investigation without access to records and information uniquely in Maxwell's possession that he refused to provide.  Nonetheless, given the magnitude of the suspicious transactions at issue, BigID continued the Investigation as best it could.  A conservative estimate of the number of hours that BigID employees have expended in connection with the Investigation is approximately 400 hours.  On top of that, Marcum charged BigID approximately $ 8,400 for its forensic accounting work in connection with the Investigation.  If additional information is provided or obtained, BigID may need to re-engage Marcum's services.

### Maxwell's Abuse of the Expense Reimbursement System

33.    Maxwell has engaged in a widespread abuse of BigID's expense reimbursement system.  Maxwell, as a senior executive, had a fiduciary duty to act in the best interests of BigID but, as reflected at least in part in Exhibit A and as alleged more fully below, Maxwell abused his position and abused BigID's expense reimbursement system to obtain—unjustly—tax-free monies from BigID, in excess of Maxwell's generous salary, benefits and BigID stock options.  Maxwell was not entitled to the monies he received as a result of the abuses alleged below and

itemized and reflected in Exhibit A.

34.     Exhibit A is an itemization of Maxwell's abuses of BigID's expense reimbursement system based on the information BigID has gathered to date because Maxwell resigned rather than answer Plaintiffs' inquiries and cooperate in the Investigation further.  As Maxwell was informed on at least March 25, 2025, BigID believes that there may be additional expenses that have been improperly claimed, over and above what is itemized in Exhibit A.  The propriety of those additional expenses claimed by Maxwell requires, at a minimum, information uniquely in Maxwell's possession, if such information exists at all.

35.     If all of those additional expenses were in fact improperly claimed by Maxwell, the total of those additional, improperly-claimed expenses is approximately half a million US dollars ($ 500,000).  Even without those additional expenses, though, and after approximately seven to eight months of investigatory work, BigID has identified and itemized hundreds of expenses that are reflected in Exhibit A, which still excludes expenses under $ 25.  The improper expenses reflected in Exhibit A total approximately a quarter of a million US dollars ($ 250,000).

36.     In general terms, the improper expenses itemized in Exhibit A reflect:  (A) expenses that are fraudulent on their face and/or (B) improper expenses which are at a minimum violative of the Policy and reflect Maxwell's lack of transparency and unwillingness to act in accordance with the duties he owed to BigID as a senior-level executive.

37.     As set forth below and as reflected in Exhibit A, BigID investigated Maxwell's expense claims thoroughly for months with the partial information to which it had access (solely due to Maxwell's lack of cooperation), including nearly 750 individual receipts.  That thorough investigation has included, *inter alia*, pulling the relevant expense records accessed from and processed in this District and/or New Jersey, checking them against Maxwell's travel itineraries

and business schedule, and conducting interviews with relevant personnel, including Maxwell

and his manager, who is based primarily in New York.

38.    It is not simply how often Maxwell abused BigID's expense reimbursement

system; it is how brazenly Maxwell abused that system for illicit personal financial gain to the

detriment of BigID.

39.    Maxwell used the system to claim reimbursements unjustly and wrongly, and

those unjustly-claimed reimbursements became unjustified, tax-free supplements to Maxwell's

generous compensation and benefits.  As a result of Maxwell's flagrant abuse, Maxwell was

enriched unjustly to the tune of, at a minimum, many tens of 1000s of dollars identified in the

laborious, but as-yet incomplete Investigation.  Moreover, BigID reasonably relied on

Maxwell—as a senior executive—submitting *bona fide* expenses claims in accordance with the

terms of the Policy Maxwell had signed and acknowledged.  At all relevant times, Maxwell was

duty-bound to conduct his travel for BigID's benefit and claim expenses for legitimate business

purposes only.

40.    Maxwell's gross abuse of BigID's expense reimbursement system appears to have

begun in or about 2022, when, as reflected in Exhibit A, Maxwell began claiming expenses

without the required documentation supporting the propriety of the expenses claimed.  Given

how extensively Maxwell traveled, mostly at his own discretion given his seniority, he had a

duty to claim expenses truthfully, to support claimed expenses with required documentation and

to respond to inquiries about expenses claimed.  Exhibit A itemizes the number of times

currently known to BigID that Maxwell failed in those duties.  As just one example, in the month

of June 2022 alone, Maxwell failed to provide sufficient confirmation that the claimed expenses

were actually incurred and/or were for a legitimate business purpose in approximately 31

separate instances, including significant charges for amounts in 1000s of dollars and for a total amount of approximately $ 20,000—again, in just a single month.

41.    As alluded to above and alleged more fully below, some of Maxwell's claimed expenses as reflected in Exhibit A are not just unsupported and/or lacking in a clear business purpose.  Some are fraudulent on their face.

42.    One example of Maxwell's fraudulent expenses claims involved submitting reimbursement requests multiple times across multiple expense reports for a particular hotel stay.

43.    An illustration of this scheme occurred in late 2023.  Maxwell submitted multiple reimbursement requests for one stay at the W Hotel Amsterdam for triple reimbursement of the same single expense.  The fraudulence of Maxwell's submissions can be seen when the dates are examined and are reflected in Exhibit A at lines 418 and 419.

44.    For a stay purportedly beginning on November 5, 2023, at the W Hotel Amsterdam, Maxwell submitted multiple reimbursement requests through different booking and expense reports.

45.    For this one stay, Maxwell then submitted a second expense report for the same hotel reflecting a stay from Sunday November 5, 2023, to Wednesday November 8, 2023 (adjusting the check-out date by one additional day).  Maxwell then submitted a third expense report for the same hotel reflecting another stay from November 5, 2023, to Wednesday, November 8, 2023.  Those reports are false representations of material fact in that they claim that each hotel stay was a legitimate and distinct expense incurred and properly reimbursable as separate expenses under the Policy as agreed to by Maxwell.

46.    For just this one hotel stay, because of Maxwell's fraudulent, triplicate expense report submissions, he received approximately $ 2,426 in tax-free money—money to which

13

Maxwell was not entitled.

47.    During the October 2024 Interview, Maxwell was confronted about these charges by the Finance Team and Legal Team Investigators, who told Maxwell that they were aware of three reimbursement requests for this single stay.  In response, Maxwell acknowledged that he had submitted three reimbursement requests and added another night to his stay, stating "Yeah yes I did yeah."

48.    A slight variation of the above-alleged scheme is reflected in line 523 of Exhibit A.  This is another scheme that, when all the relevant dates are examined, is fraudulent on its face.  To understand this variation of Maxwell's fraud, it is important to bear in mind that, when a legitimate business expense involving a flight and a hotel stay is claimed, the dates in the flight itinerary and the dates for the hotel stay should correspond or match.

49.    In Maxwell's case, the dates did not match, as demonstrated by the following. Maxwell flew from Manchester to Sydney on March 16, 2024, and then flew back from Sydney to Manchester on March 22, 2024.  However, he claimed reimbursement for a hotel stay at the W Hotel in Sydney through March 24, 2024, two days after he had already flown out of Australia back to England.  Put simply, the dates in Maxwell's flight itinerary and hotel stay did not match. Upon information and belief, someone other than Maxwell stayed two extra days at the W Hotel in Sydney, but Maxwell claimed the full stay as his own and claimed reimbursement for that full stay from BigID.

50.    Compounding the fraud described above, while Maxwell was in Australia, he appears to have taken a jaunt from Sydney to Melbourne—approximately 500 miles away, while his hotel records indicate that he simultaneously maintained a hotel room in Sydney.  It appears that way to Plaintiff because Maxwell submitted receipts for what appear to be entertainment

expenses incurred in Melbourne without having checked out of his room at the W Hotel in Sydney. Specifically, as reflected in lines 526 and 530 in Exhibit A, Maxwell claimed reimbursement for a hotel stay at the W Hotel Melbourne and dinner at a Melbourne restaurant, respectively, for a total of approximately $ 1,600.

51.     A few months later, in September 2024, Maxwell decided to repeat the scheme he perpetrated in Australia—this time in Europe. On September 23, 2024, Maxwell checked into the Moxy Hotel in Dusseldorf, Germany, and he did not check out until September 25, 2024. However, on September 24, 2024, "someone" checked into the AC Hotel in Madrid, about 1,000 miles away from Dusseldorf. That "someone" checked into the AC Hotel in Madrid presenting a different passport, with a different passport number, than Maxwell's. However, Maxwell submitted a reimbursement claim for the AC Hotel to BigID, as reflected in lines 639 and 643 of Exhibit A. This unidentified "someone" or "someones" stayed at the AC Hotel until September 27, 2024, two days after Maxwell checked out of the Moxy Hotel in Dusseldorf—again, approximately 1,000 miles away from Madrid—and one day after Maxwell himself flew out of Madrid back to Manchester on September 26, 2024. It is physically impossible for Maxwell to have occupied two hotel rooms on overlapping days in cities approximately 1,000 miles apart.

52.     Multiplying the fraud, Maxwell submitted at least two distinct expense claims for the AC Hotel in Madrid, as reflected in line 639 of Exhibit A for yet another duplicative reimbursement of the same expense. When confronted with this during the October 2024 Interview, Maxwell acknowledged the "duplication" to the Finance and Legal Team Investigators.

53.     Another fraudulent scheme, similar to the one alleged above involving hotels, involved airline flights; specifically, Maxwell fraudulently booked multiple flights to the same

15

destination and claimed separate reimbursements for multiple flights and/or upgrades for flights.

54.     One example of Maxwell's airline scheme relates to flights Maxwell booked for travel in the Fall of 2024.  On September 24, 2024, Maxwell booked a flight from Manchester to Zurich that departed Manchester on October 6 and returned from Zurich to Manchester on October 9.  Five days later on September 29, 2024, Maxwell booked a flight from Manchester to Dusseldorf that departed Manchester on October 7 and then another flight leaving Dusseldorf going to Munich on October 8.  The fraudulence of Maxwell's submissions can be seen when the dates are examined and are reflected in Exhibit A at lines 615 and 662.

55.     Maxwell booked himself a flight leaving Manchester on October 7 when he had five days earlier booked himself a flight that would have put him in Zurich on October 7.  When confronted about this, Maxwell acknowledged that he had not in fact taken any of these flights. Maxwell nonetheless attempted to seek reimbursement for all of this travel as though it were all separately and distinctly reimbursable.  Maxwell sought reimbursement for this travel in an attempt to obtain over $ 1,000 in tax-free money from Plaintiff—money that Maxwell was not entitled to be paid.

56.     Maxwell also employed a variation of the scheme alleged above with respect to airline flights, again in a fraudulent attempt at receiving more in reimbursement than was proper pursuant to the Policy or in accordance with his fiduciary duty.  An example of this variation was executed by Maxwell at various points in 2023 and is reflected in lines 222, 226, 376 and 401 in Exhibit A.  Maxwell's intent to mislead is demonstrated at least by the fact that he submitted multiple (duplicate or in some cases triplicate) reimbursement claims and/or reimbursement claims for disjointed portions of trips across multiple expense reports—all in an effort to avoid detection and reap as many unjustified reimbursements as possible.  This claim-spreading

behavior also violated the Policy, which required all expenses be submitted within 30 days of when they were incurred.

57.     On February 22, 2023, Maxwell submitted two reimbursement claims for a flight from Manchester to Dubai based on an email booking.  Months later on July 25, 2023, Maxwell submitted a third reimbursement claim for his Manchester to Dubai trip, this time to obtain reimbursement for a gratuitous and unjustified upgrade to First Class (which the Policy specifically prohibits) and re-submitting a claim for reimbursement for travel from Dubai to Manchester on that basis for this same trip, adding to it only an additional leg of travel from Dubai to Sydney.  Because Maxwell had already submitted a claim for reimbursement and been reimbursed for his airfare from Manchester to Dubai, he knew it was improper to submit another claim for reimbursement for that same travel, the only difference being the addition of a flight from Dubai to Sydney.  The correct thing to do that would have complied with BigID's Policy would have been to submit a claim for only the Dubai to Sydney leg of the trip in July.  Maxwell knew the re-submission of a reimbursement claim for travel from Manchester to Dubai was false at the time at least because by July, Maxwell had already received reimbursement for his trip from Manchester to Dubai.  Months later, on September 17, 2023, Maxwell submitted another reimbursement claim, this time in connection with upgrading himself to First Class and re-submitting a claim for reimbursement for travel from Dubai to Manchester on that basis.

58.     All total, these bogus reimbursement claims resulted in a total of approximately $ 8,200 being improperly paid to Maxwell, enriching him unjustly and on a tax-free basis.  This particular set of expenses was raised with Maxwell during the October 2024 Interview, at which Maxwell acknowledged to the Finance Team and Legal Team Investigators that he "shouldn't have uploaded" all of the expenses as separate and distinct expenses to be reimbursed separately.

59.     Another scheme involving airline flights involved improperly seeking flight upgrades and claiming reimbursement for them.  For example, and as reflected in line 625 of Exhibit A, on July 23, 2024, Maxwell submitted for reimbursement a charge in the amount of approximately $ 2,000.   The initial receipt submitted inexplicably listed a vendor called "Shop 1301" with no other details.  Maxwell submitted that receipt for reimbursement knowing that it was an improper upgrade to Emirates Airlines' luxurious First-Class cabin because, when confronted about it during the October 2024 Interview, Maxwell materially mispresented to the Finance and Legal Team Investigators that it was for a "partner dinner" at the Emirates terminal in Sydney Airport.  Maxwell later updated his story claiming that he was downgraded to an economy class seat, and Emirates only had open seats in First class.  Those representations, as well as the reimbursement claim itself, were all false.  The BigID Legal Team contacted Emirates Airlines and learned that the "Shop 1301" receipt was actually for an upgrade from Business to First Class (again, booking for either class are prohibited under the Policy), but Maxwell intentionally misled the Finance and Legal Team Investigators about the nature of this charge because he knew that that charge was improper.

60.     A third fraudulent scheme involved submitting expense reimbursements—which are only proper for business expenses—to cover Maxwell's personal expenses, incurred while entertaining romantic partners.  As a senior executive, Maxwell knew that the Policy prohibited seeking reimbursement for expenses incurred that were not wholly for the benefit of BigID and/or for expenses incurred by or on behalf of any non-BigID employee.

61.     Notwithstanding that knowledge, Maxwell has submitted multiple reimbursement claims for the benefit of romantic partners.  One of those partners was a BigID employee, for whom Maxwell improperly claimed a reimbursement that was not for a legitimate, BigID-

business purpose.  Another of those partners was not, has never been, and is not a BigID employee at all.

62.     First, as reflected in line 400 of Exhibit A, Maxwell claimed a reimbursement on behalf of a BigID employee with whom he was then romantically involved, upon information and belief, in connection with a fourth-quarter team event at the end of 2023.  That BigID employee with whom Maxwell was involved, at least at that time, upon information and belief, should not have had her attendance at an event reimbursed because her attendance was for no legitimate, BigID-business purpose.  Her attendance should therefore not have been compensated through Maxwell's claimed expenses.  Maxwell was aware that he should not have used the trust placed in him as a senior executive to help finance a romantic relationship.

63.     In addition, in connection with the same 2023 year-end holiday event, Maxwell improperly submitted reimbursement claims for three different hotel rooms, as reflected in line 420 of Exhibit A, without identifying who those occupant(s) were, as required by the Policy, to confirm that this charge for hotel rooms alone in an amount of approximately $ 1,200 was for any legitimate business purpose.

64.     In a second, more extensive version of this scheme, with a different romantic partner, Maxwell submitted false reimbursement claims in connection with a romantic partner named Beth Henshall, and those expenses are reflected in at least lines 72, 73, 250, 269, 270, 307, 312, 404, 414, 524, 557, 565, 593 and 599 of Exhibit A.  Those expenses include items from dinners to airfare to hotels.  For example, as reflected in line 404 of Exhibit A, Maxwell submitted for reimbursement on September 17, 2023, a receipt for a Saturday night dinner at Cipriani Dubai in an amount of more than $ 800.  This was not a business expense but a personal, romantic dinner on a Saturday night out on the town, enjoyed by Maxwell and Ms.

Henshall.  Maxwell knew that this was not a legitimate business expense when he submitted it

for reimbursement at least because no legitimate BigID business involved Ms. Henshall, who is

not now and has never been a BigID employee.

65.     One pattern that emerged during the Investigation was that Maxwell took

advantage of having to travel for BigID business and parlayed those business trips into multi-

day, romantic mini-breaks for himself and Ms. Henshall—at BigID's expense.

66.     Each of these reimbursement claims included false statements of material fact

which Maxwell knew were false when they were submitted for several reasons, the principal

reason being that Ms. Henshall is not, was not and has never been an employee of BigID or

BigID UK and has no business with or for BigID.  BigID's Policy pursuant to which all expense

claims are to be submitted does not allow anyone to claim expenses incurred by or for the benefit

of a non-Big ID employee such as Ms. Henshall.

67.     A separate reason demonstrating that Maxwell knew that his submission of

reimbursement requests covering Ms. Henshall's expenses was false when made is that, when

Maxwell originally submitted a receipt for reimbursement for a flight to Milan from departing on

April 27, 2023, only his name appeared as the passenger and the receipt submitted only reflected

one ticket number.  However, on January 7, 2025, in connection with ongoing attempts to

resolve this matter out of court, Maxwell (presumably inadvertently) submitted a different

version of the receipt he claimed was in fact the "original" receipt for this same trip.  That

"original" version listed both Maxwell and Ms. Henshall's names as passengers, each with

separate ticket numbers.  Thus, it seems plain that the first receipt Maxwell submitted when he

was still a BigID executive for this April 2023 trip to Milan was manipulated and/or doctored by

Maxwell to remove his romantic partner's name and ticket number from the receipt.  Maxwell

intentionally manipulated and/or doctored that business record so that he could use that doctored record to support a false reimbursement claim to obtain without justification money to which he was not entitled. Maxwell removed Ms. Henshall's name to conceal that Maxwell was fraudulently claiming expenses for a romantic partner, a non-BigID, non-BigID UK employee, in violation of the Policy and as reflected in line 250 of Exhibit A.

68.     However, this one flight to Milan was not the only expense that Maxwell knowingly claimed for reimbursement, even though the expenses were incurred for the benefit of non-employee Beth Henshall, for a purpose wholly unrelated to BigID's business. Maxwell also treated Ms. Henshall to a six-day hotel stay at the ME Milan Il Duca Hotel-Melia, as reflected in line 269 of Exhibit A.

69.     Indeed, Maxwell has, at BigID's expense, appeared to have treated Ms. Henshall to a virtually all-expenses paid vacation insofar as he also claimed reimbursements for other expenses incurred during their Milan mini-break, such as Uber trips and visit to a Milanese café, reflected in lines 307, 312, and 314 in Exhibit A.

70.     At this time, Maxwell was indeed traveling to Milan for business that would have required him to be in Milan—without his romantic partner—for a single day. Maxwell then seized the opportunity of converting travel to Milan for BigID business into a six-day romantic mini-break at BigID's expense. The fact that Maxwell deliberately choose to use a work trip to Milan as cover for a six-day romantic getaway with Ms. Henshall demonstrates that, when Maxwell submitted expense claims in connection with what became a six-day mini-break in Milan, he knew that those claims were fraudulent and that, by combining his romantic holiday with a business trip to Milan, he could conceal the fact that he was fraudulently claiming his romantic holiday spending as business expenses.

71.     In June of 2024, Maxwell partially repeated the scheme alleged above—this time in connection with an on-site business meeting in Valencia, and, this time, making his scheme fraudulent in more ways.  Maxwell turned the Valencia trip into a veritable fraud spree (the "Valencia Scheme") by fraudulently claiming expenses in multiple ways.

72.     First, and similar to what was alleged above in connection with the Milan trip, Maxwell used a planned business meeting in Valencia yet again to treat at least Ms. Henshall to a three-day mini-break.  Maxwell's Valencia Scheme was even more egregiously fraudulent and improper for at least the following reasons:  (A) Maxwell was explicitly warned by his manager, BigID's Chief Revenue Officer, that he could not turn a business trip to Valencia into a personal getaway compensated through BigID—prior to the trip; (B) Maxwell ignored that explicit warning and (C) Maxwell's jaunt through Spain apparently was not limited to Ms. Henshall in light of the fact that Maxwell submitted expense reimbursements for what appears to be three additional hotel rooms for three unidentified adults during this personal getaway.  Upon information and belief, this booking of three rooms was either an unauthorized excursion for additional but as yet unidentified friends and/or companions who are not now or have ever been a BigID employee, or Maxwell submitted reimbursement claims for hotel rooms upon booking them, even if they were not used.  Under either explanation, Maxwell's reimbursement claims were duplicative, fraudulent and improper.

73.     Similar to the romantic trip to Milan, Maxwell claimed expenses for a personal trip involving at least Ms. Henshall and, upon information and belief, additional non-BigID or non-BigID UK employees, as reflected in at least lines 521 and 524 in Exhibit A.  Also, and again much like the romantic getaway to Milan, Maxwell claimed reimbursement not just for basic expenses associated with a trip but for entertainment on that trip as well, including but not

limited to a Beach Club reservation as reflected in line 599 of Exhibit A, as well as additional entertainment as reflected in lines 565 and 593.

74.     It was improper and fraudulent for Maxwell to claim personal expenses for himself and at least Ms. Henshall incurred prior to the meeting Maxwell was actually supposed to attend in Valencia.  Maxwell's fraud in the Valencia Scheme did not, however, end there.  The fraud continued even after, upon information and belief, Ms. Henshall and/or additional friends left.  In connection with the expenses Maxwell incurred for his actual business in Valencia, he submitted separate, duplicative expense claims to obtain double or triple recoveries of expenses—an unjustified, tax-free windfall.  Those duplicative expenses are reflected in lines 521, 590, 603 and 621 in Exhibit A.

\*\*\*

75.     During the October 2024 Interview, Maxwell acknowledged that he had submitted multiple, duplicative expense claims that resulted in him receiving multiple reimbursements in excess of amounts to which he was legitimately entitled.  Ultimately, when his expense reimbursements were frozen, called in for the October 2024 Interview, and confronted with the magnitude of his reimbursement claims that were being scrutinized, Maxwell realized that the jig was up, and the tax-free windfalls he had been unjustly receiving were at an end.  Accordingly, and as alleged above, in the days following the October 24 Interview, Maxwell stopped cooperating with the Investigation and resigned when he learned of BigID's intention to institute disciplinary proceedings that could result in his termination for cause.

## COUNT I FRAUD

76.     Plaintiff repeats, reiterates and realleges the allegations in paragraphs 1 through

75 as though fully set forth herein.

77.     As alleged above, Maxwell has submitted expenses claims that contained false representations of material fact, and the central false representation of material fact is that the claimed expenses were legitimate, proper and in accordance with BigID's Policy.

78.     However, those representations were false, in that, and for the reasons further identified above:  (A) claims for one expense submitted multiple times to obtain multiple reimbursements are not legitimate, proper and/or in accordance with BigID's Policy; (B) claims for personal expenses, including expenses for romantic partners, are not legitimate, proper and/or in accordance with BigID's Policy; and/or (C) claims for expenses that would have been physically impossible to have been incurred as claimed are not legitimate, proper and/or in accordance with BigID's Policy.

79.     Maxwell made false representations of material fact that he knew were false when made because, *inter alia*, and for the further reasons identified above:  (A) he had signed and agreed to BigID's Policy and was duty-bound to follow it in light of his senior position; (B) in some instances identified above, Maxwell deliberately attempted to obscure or hide information that would have immediately reflected the impropriety of his expense claims; (C) in one instance identified above, Maxwell had been explicitly informed by his superior that personal expenses could not be claimed under the Policy and/or (D) in some instances identified above, Maxwell had already received reimbursement(s) for an expense that he then re-submitted for additional reimbursement.

80.     At all relevant times, Maxwell did intend that BigID would rely on his false representations, including apparently forged and/or altered business records, because, only by inducing reliance by BigID would Maxwell be paid.  In other words, the primary if not the only

purpose of Maxwell's false representations was that BigID would rely on them and thereby reimburse Maxwell with monies to which Maxwell had no legal entitlement.

81.     Given Maxwell's senior position, the fact that Maxwell had signed and acknowledged BigID's Policy, and the fact that, in some instances as identified above, Maxwell used legitimate business travel as cover for improper reimbursement claims for personal expenses, BigID reasonably and justifiably relied on the veracity of Maxwell's expenses claims.

82.     As a result, BigID is aware of having suffered at least the damages reflected in Exhibit A.  However, as alleged above, Maxwell has refused to cooperate further with the Investigation that was ongoing when Maxwell resigned and still uniquely possesses records and information regarding additional expenses for which Maxwell has been improperly reimbursed. Accordingly, while the amount of damages resulting from Maxwell's fraud can only be estimated now, the current estimate is that BigID has been damaged by Maxwell's fraud in an amount that is at least $75,000 but may grow substantially.

83.     As described more fully above and in Exhibit A, the Valencia Scheme encapsulates the varied methods by which Maxwell engaged in fraud in connection with his expense claims.  First, the Valencia Scheme involved Maxwell improperly claiming personal expenses, incurred at least in part to treat a romantic partner to a mini-break in Spain.  Second, the Valencia Scheme involved Maxwell submitting expenses that may have been incurred in connection with legitimate business travel multiple times to improperly receive multiple tax-free reimbursements.

### COUNT II BREACH OF FIDUCIARY DUTY

84.     Plaintiff repeats, reiterates and realleges the allegations in paragraphs 1 through 83 as though fully set forth herein.

85.    As an executive with the title, responsibilities and benefits of a corporate Senior Vice-President, Maxwell owed Plaintiff a fiduciary duty at all relevant times.

86.    As alleged above, Maxwell was a very senior executive such that there were only two people in more senior roles.  As such, Maxwell enjoyed significant autonomy and was afforded broad discretion in connection with his sales and marketing role because BigID trusted him to execute his responsibilities as a Senior Vice-President for BigID's benefit.

87.    In that very senior role, Maxwell at all relevant times owed BigID the duty to act with the utmost good faith and loyalty toward BigID, the duty of trust and confidence, and the duty to refrain from abusing BigID's expense reimbursement policies and systems for Maxwell's own personal benefit, or to BigID's detriment.

88.    The duty to refrain from abusing BigID's expense reimbursement policies and systems for Maxwell's own benefit or to BigID's detriment was something Maxwell was aware of because Maxwell knew that BigID would expect Maxwell to travel regularly for his very senior role in sales and marketing.

89.    In light of that expectation, and the trust Maxwell was afforded in setting his schedule and travel, Maxwell was duty bound to incur travel for the benefit of BigID only and for BigID business only, to report and claim travel-related expenses truthfully and completely, and to provide supporting documentation justifying claimed expenses.  Otherwise, and as Maxwell has aptly demonstrated, a faithless servant like Maxwell can abuse and breach his duties to supplement his income through reimbursements improperly and/or fraudulently claimed.

90.    Moreover, as a senior executive, Maxwell was duty-bound to ensure that "books, records and statements" to be used by BigID in, *inter alia*, the preparation of BigID's corporate

taxes and audited financial statements accurately reflected legitimate business expenses.

91.     Time and time again, Maxwell breached his duties.  Instead of incurring travel for the benefit of BigID only and for BigID business only, Maxwell has, *inter alia*, parlayed business travel into personal, romantic getaways.  Instead of reporting and claiming travel-related expenses truthfully and completely, Maxwell submitted, *inter alia*, manipulated and/or doctored receipts to conceal the fact that he improperly claimed reimbursement for a flight taken by a romantic partner.  Instead of providing supporting documentation justifying claimed expenses, Maxwell stalled, demurred, provided only partial information and ultimately resigned.  Maxwell has since refused to offer any cooperation, despite continuing efforts by Plaintiff to get to the truth of the matter, or make any effort to repay even those amounts he admitted under questioning had been improperly reimbursed to him.

92.     As a result of the breaches of the duties owed by Maxwell to BigID as alleged above and itemized further in Exhibit A, BigID has been damaged in amounts currently known to BigID to be approximately and at least $ 175,000.  BigID fully expects that that amount will rise as additional information, uniquely in Maxwell's custody if it exists at all, is produced that demonstrate that additional charges submitted by Maxwell were improper and/or fraudulent.

## COUNT III UNJUST ENRICHMENT

93.     Plaintiff repeats, reiterates and realleges the allegations in paragraphs 1 through 92 as though fully set forth herein.

94.     This Count is pleaded as an alternative count.

95.     As alleged above and reflected in Exhibit A, Maxwell came into possession of 1000s of US dollars of tax-free monies as a result of hundreds of improper expense claims that Maxwell, upon information and belief, should have known were improper for, at a minimum,

failing to comply with the Policy.

96.    As alleged above, because Maxwell resigned as the Investigation was ongoing and there are still 100s of additional, outstanding expense claims being investigating but requiring information from Maxwell, Plaintiff does expect that, beyond what is itemized in Exhibit A and alleged above, there are additional amounts of tax-free monies unjustly obtained by Defendant.

97.    Maxwell has no entitlement and has never had any entitlement to the tax-free monies he has received from any of his improper expense claims, including but not limited to those itemized in Exhibit A.  Because Maxwell had and has no entitlement to, at a minimum, the tax-free monies he has received as itemized in Exhibit A, his receipt of those funds has been an unjust, tax-free windfall that has significantly enriched Maxwell but has significantly harmed BigID.

98.    To the detriment of BigID and for his own, personal financial gain, Defendant has been unjustly paid for expenses that were not properly incurred and/or claimed in an amount that is at least hundreds of thousands of dollars, conservatively estimated at this time to be approximately $ 250,000.

## JURY DEMAND AND PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands a jury trial on all triable issues and requests the following relief:

(a) Judgment in Plaintiff's favor against Defendant;

(b) Damages, including but not limited to recoupment of all payments made to the Defendant during his tenure with Plaintiff that Defendant obtained through fraud, in breach of his fiduciary duty and/or by which he was unjustly enriched in an amount to be determined at trial but which shall not be less than $ 250,000;

(c) Costs and attorneys' fees incurred in connection with this proceeding and the Investigation as alleged above; and

(d) Granting Plaintiff such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York

July 7, 2025                                         LEWIS & LIN, LLC

By:

Brett Lewis, Esq.

77 Sands Street, 6th Floor
Brooklyn, New York 11201
Tel: (718) 243-9323
Fax: (718) 243-9326